Walter Ewing, Appellee, v. Arctic Ice Cream Company and Solomon Neuderman, Appellants.

Master and servant: evidence of relationship. In this action for injuries caused by the alleged negligent operation of an automobile, the evidence is held to sustain a finding that a certain one of defendants was conducting the business in connection with which the

automobile was being used, and that the driver of the machine was in his employ.

**Evidence:** ADMISSIONS: INSTRUCTIONS.   Where an issue is predicated upon the admissions of a party such evidence should be received with caution, and it may be well under some circumstances for the court to call the jury's attention to this fact.   But where there was substantive evidence in support of the controverted point aside from the admissions of the party, failure of the court to advise the jury that evidence of that character was weak and unsatisfactory was not erroneous, in the absence of a request therefor.

*Appeal from Polk District Court.*—HON. CHAS. A. DUDLEY, Judge.

SATURDAY, MAY 16, 1914.

ACTION to recover damages for an injury occasioned by the negligent operation of an automobile upon the public streets of Des Moines.   Verdict and judgment for the plaintiff. Defendants appeal.—*Affirmed.*

*Miller & Wallingford* and *Oliver H. Miller,* for appellants.

*Brown & Missildine,* for appellee.

GAYNOR, J.—It appears that on or about the 15th day of July, 1912, the plaintiff herein was sitting on the north edge of the sidewalk on the north side of East Locust street at a point where an excavation was being made, immediately north of the sidewalk, and, while sitting there, an automobile operated by one Chas. Pultz skidded from the street onto the sidewalk on which plaintiff was sitting, and struck a barricade placed around the excavation and precipitated the plaintiff into the basement, causing him injuries for which he brings this action.   He alleges that the said Chas. Pultz was in the employment of the defendants and was operating the automobile in and about their business; that the automobile was negligently run by the defendant, and plaintiff was injured as the proximate result of such negligence.   The defendant

Neuderman appears and answers plaintiff's claim and says that at the time, and prior to the time, plaintiff was injured, the Arctic Ice Cream Company was owned and operated by one S. Carr and C. R. Campbell, who were copartners and carried on the business under the firm name and style of the Arctic Ice Cream Company; that this defendant had no interest or ownership in said firm, except that the firm owed him $1,250, secured by a chattel mortgage on the plant and equipment. Defendant further says that after July 15, 1912, and after the time plaintiff was injured, the said Carr & Campbell transferred to the defendant the entire equipment and business of the said Arctic Ice Cream Company, together with the good will and name of the firm, in satisfaction of said indebtedness, secured by the mortgage aforesaid. The defendant, further answering, says, as to the matters complained of, he has no knowledge, therefore denies the same, and asks that plaintiff's petition be dismissed. Upon the issues thus tendered, the cause was tried to a jury. The jury returned a verdict for the plaintiff. The defendant filed a motion for a new trial. The motion was overruled, and judgment entered for the plaintiff, upon the verdict. From this judgment, the defendant appeals and assigns several errors, all based upon one thought, to wit, that the evidence submitted to the jury was wholly insufficient to justify a verdict against this defendant, and therefore the court erred in not sustaining a motion to direct a verdict for the plaintiff, at the conclusion of the plaintiff's testimony, and the court erred in overruling defendant's motion for judgment, notwithstanding the verdict. The court erred in overruling defendant's motion for a new trial.

It cannot be reasonably contended that, under this record, the jury were not justified in finding that the plaintiff was injured substantially as claimed; that his injury was caused by the negligent manner in which the automobile was operated, at the time, by Chas. Pultz. The only question is as to who is responsible for the conduct of the said Chas. Pultz? Who should be called to respond in damages for his negligence?

1. MASTER AND SERVANT: evidence of relationship.

The defendant says that the automobile, at the time that plaintiff claims he was injured, belonged to the Arctic Ice Cream Company; that the plant, at that time, was owned by Carr & Campbell; that they were a copartnership; that the defendant had no interest or ownership in the firm except as mortgagee; that Pultz was not in the defendant's employ, was not operating the automobile for the defendant, and the defendant had no control over said Pultz or said automobile; that Pultz was not the defendant's servant or agent, and was not in and about the defendant's business in any respect, and therefore the defendant is not liable for any negligence on the part of Pultz.

This is a question of fact, a fact about which there is a sharp controversy in the evidence.

The plaintiff testifies: That on the day of his injury he went over to the ice cream factory and asked for the proprietor. They directed him to the bottling works run and operated by the defendant Neuderman. That he went there and met Mr. Neuderman, and asked him for the proprietor of the ice cream factory. That, when he asked Neuderman for the proprietor of the ice cream factory, Neuderman said, "I am the proprietor." That thereupon he said to Neuderman, "I want to see what you people are going to do about your automobile breaking my collarbone." He said, "I have no automobile." "I then said, 'The automobile that was in your employ.' 'Well,' he said, 'I will have to see the boys about that,' and so he told me to come back the next morning. I went back the next morning about 10 o'clock and met Pultz. He tried to deny that the automobile had hit me. Then Mr. Neuderman told me to come back in the afternoon, so I left Neuderman and went over with Pultz to the police station to see the chief. The captain told me to go and see Neuderman again. I went back over there in the evening. Mr. Neuderman had told me to come back at 5 o'clock. He then acted as if he did not want to have anything to say about it; kept walking around. Finally, I said, 'Mr. Neuderman, I am back now to see what

you all intend to do with me about this accident,' so we went over to the factory, and he sat down as if he were about to do some figuring. Then he got up and said something to Campbell and Pultz. Pultz says, 'It is up to you to settle with that man.' He turned around to me and said, 'Will you come back tomorrow morning at 10 o'clock?' So I went back the next morning at 10 o'clock. He says: 'I will tell you what I will do. I'll go and try and scare these boys into this and make them pay you something. I will tell them you are going to have them arrested, or to have a lawsuit or something. It is better to pay you something than it is to go to court and have the trouble and hire a lawyer.' I said, 'I don't care what you do, so you pay me.' So he told me to come back in the evening. So when I came back, Pultz told Neuderman that evening: 'I am not going to pay anything. I haven't anything.' When I said, 'It is up to you to pay,' Mr. Neuderman turned around to Campbell, and he said he would not pay; that he was working for wages. Then Mr. Neuderman started out where there was a milk wagon turned over. He said, 'You see this wagon and milk turned over there?' and I said, 'Yes, sir.' He said: 'The man he ran into Saturday will be here with a whole lot of trouble. I can pay you nothing. You have been a good fellow and haven't kicked up much noise. I will give you $5 out of my own pocket.' '' On cross-examination, the plaintiff said: ''I didn't see Neuderman until the next morning after I was hurt. I saw Campbell the evening I was hurt. Neuderman said, if the boys didn't pay, he would take it out of their wages. I told him he was the proprietor, and he never denied it. It was the third or fourth time I was there that he said he would scare the boys into a settlement.''

One Morris Hoffman, called for the plaintiff, testified that he knew the defendant Neuderman. Said that about the end of April, 1912, he went to Mr. Neuderman and said: ''You have two businesses and I got a team. Can you use me for delivery for one of your businesses?'' Neuderman said, ''I have no use for you in the pop business, but go over

to the ice cream business, and tell them that I sent you there to get employment.'' He asked me what I wanted for my work with a team, and we agreed on $2.50 a day for my work. I went over the street to the Arctic Ice Cream plant and told them that Neuderman sent me to get a job. They told me they had no present work, but to come back soon. I gave my address. A few days later, they sent for me. I went to work there. My duties were delivering ice cream to the stores. The foreman sometimes asked me to do inside work. Neuderman often came to the ice cream place and told the foreman that when they sent out with ice cream, he wanted to put some cases of pop on the load, so the pop was loaded on with the ice cream. I loaded and delivered pop and ice cream at the same time and in the same wagon. When I first went there, he told me he had enough people in the pop business, but he would give me a job in the ice cream business. I worked there from the end of April into June. At the end of June, the foreman told me that they had an auto truck that would do the work, and they didn't need me any more. I complained to Mr. Neuderman of their sending me away. He said, 'Well, I told him to send away the boy, not you.' Soon afterwards, they took me back. That was on the 3d of July.''

It appears that prior to the 1st day of March, 1912, the defendant Neuderman was the owner of this plant; that on that day he made a bill of sale to Carr & Campbell for $1,750; that on the same day Carr & Campbell paid the defendant, Neuderman, $500, and executed to him a note for $1,250, the first payment on which appears to be due July 5, 1912, and, to secure said note, executed a mortgage to the defendant Neuderman, in which the first payment appears to be due June 5, 1912. This mortgage provides that if default is made in the payment of any of the installments provided for, or whenever the mortgagee should choose to do so, then it shall be lawful for the mortgagee, Neuderman, to take immediate possession of the goods and chattels, wherever found; the possession of the mortgage being sufficient authority there-

for. It appears: That default was made in the first payment provided for by the note. That, when this first payment became due, defendant urged immediate payment. They promised it, but put him off from day to day. That Carr said he had no money and couldn't pay it unless he could get it from his father-in-law in Ottumwa.

The defendant testified: ''I asked them for this money on the 5th of July. Both Campbell and Carr were there. They put me off tomorrow and tomorrow. A few days afterwards, I told them 'You've got to pay that $100.' Carr said: 'To tell you the truth I can't pay it. I have to go and see my father-in-law.' He went and never came back. He went a few days after the 5th.''

It appears that the defendant Neuderman paid the help, on the Saturday following the accident, for the week preceding, which would be for the week commencing Saturday the 12th.

Plaintiff further testified that Carr had been gone for a couple of weeks before the bill of sale to the defendant was signed. He claims the bill of sale was signed on the 25th or 26th. He said further that Carr and Campbell both had left prior to the time of the accident. He further testified that Campbell was not attending to business.

Defendant claims that he paid the help off, from and after July 14th, on the promise of Campbell that he would pay him back on Monday.

Anderson, testifying for the defendant, said Carr left for Ottumwa a little after the 1st of July.

From this, the jury might have easily found that the bill of sale was given to avoid a foreclosure of this mortgage; that the defendant had taken possession on the 14th and was in possession, under his mortgage on the 15th; and that it was being then operated by this defendant, pending a settlement and adjustment of his claims under the mortgage. It is not material who was, in fact, the owner of this property. The question is: Who was managing it and controlling it?

The defendant admits he paid all wages of men from and after · the 14th. The jury had his explanation of this. The jury had his explanation of all the other matters, and his denials of every fact, practically, testified to by the plaintiff's witnesses. There is much confusion and contradiction in defendant's testimony that leaves the mind in doubt as to whether the defendant is relating facts as they actually occurred. The jury were the judges of the credibility of the witnesses and the weight to be given to their testimony, and we cannot say that they erred in the conclusions they reached under this record.

The court, in its instructions, said to the jury: "The fact that the defendant had a chattel mortgage upon the property and the property was employed in the manufacture of ice cream, the fact that the defendant, at the instant request of one or both of the owners, paid debts, including bills for labor incurred by them, would not, alone or together, establish the fact that, on the day of the accident, the defendant was engaged in manufacturing and distributing ice cream; but these facts may be considered by you in determining whether or not the defendant had repossessed himself of the property sold to Carr & Campbell, and when he took such possession; whether at the time of the accident he was in the possession of the property and engaged in the manufacture and distribution of ice cream; and whether or not he was engaged in the act of distributing ice cream with this automobile at the time the injury occurred." And the court further said that: "The only persons who were liable are those who are actually doing business under the name of the Arctic Ice Cream Company at the time of the injury, and to hold said Neuderman liable in person, or under the name of the Arctic Ice Cream Company, the jury must find that he had repossessed himself of the property under the mortgage, and was, at the time of the accident, engaged in the manufacture and sale of ice cream, and was engaged in operating the automobile truck in question, in the distribution thereof, thus squarely submitting to the

jury as a fact whether or not, prior to the time of the accident, the defendant Neuderman had repossessed himself of this property as he had a right to do, under the terms of his mortgage, and was then operating the plant and distributing his product, through the instrumentality of this automobile, at the time the plaintiff received his injury.''

No complaint is made of these instructions in respect to this matter, and this question was fairly submitted, and the jury have found in favor of the plaintiff's contention, and there is evidence to justify the verdict, and we cannot disturb it.

It is, however, contended that the court erred in not telling the jury that the plaintiff's case rested

2. EVIDENCE: admissions: instructions.

mostly upon admissions made by the defendant, and that this testimony is of a very weak and unsatisfactory character.

The statements of a witness, as to admissions, should be received with great caution. But the plaintiff's case does not all rest on admissions. There are substantive facts appearing in the record, which tend to support plaintiff's claim upon the controverted point. There is the conduct of the defendant. There is the fact of default in the payment. The fact that Carr had left; the fact, testified to by defendant himself, that Campbell was not attending to business; the fact that the default occurred on the 5th of July; the fact that this instrument, which was procured for the purpose of avoiding foreclosure, was written on the 16th—all tend to support the conclusion that the defendant had repossessed himself of this property, prior to the time of the accident, and was operating this automobile in the distribution of the products manufactured by him at this plant. While it is well, under some circumstances, to caution a jury against this sort of testimony, it is not required in every case. Nor do we think it required in this case. If the defendant had desired a special instruction on this point, it should have requested it.

On the whole record, we find no reversible error, and the cause is—*Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concurring.